Metro-North v. Department of Labor. Good morning. May it please the court, my name is Beck Feynman. I represent the petitioner in this case, Metro-North Commuter Railroad. I thought it would be wise to start this morning with the jurisdictional issue that came up first in a footnote in the Department of Labor's principal brief and was addressed more fully in the supplemental briefs that this court permitted the parties. I acknowledge that this issue was not raised before the agency and this was the unfortunate result of how the litigation proceeded and the way that everybody, including the agency, was looking at the case at the time that it first was heard. Why doesn't our president thus foreclose your argument on the jurisdictional issue? Well, first, to the extent that it does implicate subject matter of jurisdiction, that can always be raised. And second, Metro-North did raise jurisdictional... It doesn't go to the subject matter of jurisdiction of the court, does it? It would go to the subject matter of jurisdiction of the agency. And that is waivable. I believe that it is not waivable, Your Honor. If, even if it is though, Metro-North did raise jurisdictional challenges below. They were on different grounds that stemmed from our arguments under the Railway Labor Act and the timing of the effective date of the statute versus the complaint of conduct. Does it affect this court's jurisdiction? It would affect this court's jurisdiction and that would be because at all times when action was taken, so when OSHA acted, when the ALJ acted, when the ARB acted, when the ALJ acted again, when the ARB acted again, and when this appeal itself was the interpretation that OSHA had given to the subsection was that it was not a whistleblower provision. So it should not... So was that really a disclaimer of jurisdiction over these claims? I mean, it just wrote two sentences in passing in this interim final rule and it didn't say we disclaim jurisdiction. It just characterized the provision as not a whistleblower provision. But it really, that was something less, wasn't it, than a full disclaimer of jurisdiction over these matters? I think it was a disclaimer of jurisdiction because their jurisdiction as they understood it... It didn't say those words, did it? It did not. It was not an express... No, it just said Section C is not a whistleblower provision. That's right. In your view, that amounts to a disclaimer of jurisdiction? Yes, because of the way that the authority was delegated to the agency in the first place, which was although the statute said under the Enforcement Action Provision, subsection D, that an aggrieved employee could bring action alleging any violation of subsection A, B, or C, it also said it was limited to discharge, discipline, or any other form of discrimination. And it's a stretch to read this as any other form of discrimination. It's clearly not discipline or discharge. So the Enforcement Action under subsection D only permits an employee to bring this type of action for a truly whistleblower aggrievement, and that would exclude, as OSHA found, subsection C. It makes sense, and I can talk about why that makes sense separate from the jurisdictional argument if the court wishes, but I do think that that OSHA should be bound by its own interpretation of its statute all the way through the time when this appeal was filed. And I think, you know, the DOL makes an argument in one of its papers submitted to this court that we should have raised it below, and had we raised it below, the ARB probably would have dismissed it. That doesn't make any sense. I mean, if we could have and should have raised it below, had we done that, I think the ARB would have had to look at OSHA's own interpretation of its statute that it was charged with enforcing and say, okay, well, if OSHA doesn't think that this was a whistleblower provision, then we don't have jurisdiction to hear it. If the ARB didn't have jurisdiction, then I don't think it's appropriately before this court. But the statute 20109D specifically says that an employee can file a complaint with the Secretary of Labor for violations of, among others, subsection C. I mean, isn't that clearly a grant of jurisdiction to the Secretary of Labor to hear such claims? No. And this is why, as I said before, the first part of that provision says an employee who alleges discharge, discipline, or other discrimination in violation of A, B, or C. That makes sense, and it tracks the language of subsections A, subsections B, and subsections C too. But subsection C-1 is unique. It's not, there was no discharge, there's no discipline, and it would be erroneous to look at this as some other form of discrimination. But it says for alleged, for violations of C, and that's what the plaintiff here, or Mr. Santiago here, was alleging. He was an alleging, he was alleging a violation of subsection C by virtue of the alleged denial, delay, or interference. Why can't other discrimination be understood to encompass a delay or interference with medical treatment? That would defy the Supreme Court's definition from just last year, for example. There was a case decided the Alabama Department of Revenue versus CSX Transportation. It's at 135 Supreme Court 1136, and that was from March of 2015. There, the Supreme Court said that discrimination should be afforded its ordinary meaning, and that is that, and that is treating groups that are similarly situated differently without justification for the difference in but it doesn't fit C-1. I think the placement of C-1 was unfortunate. I don't think that Congress necessarily thought through how this was going to work. They sort of stuck it in where, and then said the, the Air 21 burdens of proof should apply, but there's nothing like this in Air 21. So we're left with this quagmire of, of very ambiguous enforcement mechanisms. So... Well, if the Secretary of Labor doesn't have jurisdiction over this C-1 provision, what agency does? I'm not suggesting that they don't have jurisdiction over subsection C. I think that they clearly do. It's the enforcement action that they don't have, that was, that was not proper. They, there can't be a subsection D enforcement action under this statute for an alleged violation of C-1. It doesn't make sense. It doesn't work. It defies the plain text. It defies logic. The plain text of the statute is that, that there is jurisdiction over C. That's set out in D. And again, I, I would, I would direct the Court to look at the first, the first portion of subsection D as I, as I said before. So I think that, that the DOL still has enforcement authority, and they have mechanisms for enforcing statutes. It's, they have enforcement, and experience enforcing provisions that are non-whistleblower provisions, and still aimed at, at ensuring employee safety at the workplace. And I think this would be a, a, a completely valid use of that type of enforcement authority versus an adjudicative action under subsection D. So that means you think the final rule is wrong? I, I do believe the final rule is, is wrong. Yes, I do. We're, I don't suggest that, that it's not binding. It, it is at this point. But I don't think that it  You're saying it's not authorized by the statute. I don't think it makes sense. I think it's the wrong interpretation. I, I do. And, and the final rule came about in large part by virtue of decisions that were made below in this case. And I think if we follow the trajectory of this case, I think that the ALJ the first time around had it right. I think she interpreted the statute correctly. I think that the ARB made a mistake in its interpretation on appeal. And I think it was that the DOL was looking for and looking to in deciding the, the, or coming up with the final rule. Could you take a minute as your time is winding down to address the ALJ's finding that Mr. Ella and Dr. Hildebrand's medical explanations for their actions were implausible and pretextual, and that Metro-North had some leverage over them by virtue of the nature of the contract with Take Care Health. And you know why you think it was unreasonable for the ALJ to infer that Metro-North had influenced the medical decision to treat the, or to classify the injury, categorize it as having been resolved despite the ongoing symptomatology. Was that unreasonable? I'm sorry. Just, I just wanted to circle back to make sure my question was clear. Sure. The contract itself can't provide, just by virtue of there being a contract, that can't be enough to say that Metro-North exerts absolute control over OHS. There is no, contrary to what the ARB found in the, or the way that it read the contract, there is no provision in the contract that would allow Metro-North directly to affect the personnel decisions of OHS personnel. But didn't they have the authority to order the transfer out of the on-site people of Take Care Health, people they were dissatisfied with, for example? Yes, they did. And didn't they have Angela Pitara working there daily and kind of able to review how the individuals were comporting themselves? Angela Pitara's job was a little bit different than that, and there's no indication that she ever, ever in her history with Metro-North took such action or reported to Metro-North that somebody should be removed. There's no history of that. But they had physical presence in her, by virtue of her job. Yes, there was one Metro-North employee who was headquartered in OHS, which I think, you know, if you look at any corporation that subcontracts some of its services, I think that's entirely appropriate. So the ARB seemed to be saying that had Metro-North sent Mr. Santiago to a dock and a box elsewhere, that any decisions made there or classification of the injury as resolved or not resolved would have been clearly independent. But by virtue of the control that Metro-North exerted, that that was enough for Metro-North to basically own the decisions of Ella and Hildebrand. And since the ALJ found them, she was skeptical of their medical decision that the injury had resolved, that that should be attributed to Metro-North and be seen as an interference. So why is that unreasonable as an inference? Well, there's two things I'd like to say about that, if I might. The first is that had Metro-North sent Santiago off-site to a different doctor and the different doctor took all the same courses that his treating chiropractor did and Metro-North disagreed with that or had questions about it and that created a delay in his treatment, then we would be in the same situation. Under the ARB's interpretation, any time Metro-North inserts itself into the process, and that could be by way of any legal mechanism that it has. I gave examples in my papers of an FMLA request that might delay treatment or an FELA situation where there's a disagreement about the root or the cause of the injury and whether Metro-North is responsible for it. Anything like that under the ARB's interpretation would then run afoul of subsection C. I actually wanted to ask you about that to make sure I'm understanding your understanding of the ARB's rule. So one way after the statute that Metro-North could provide 100 percent coverage for work-related injuries, which I understand is not obligated to do under federal law. This is an arrangement you worked out in collective bargaining with your employees? Yes. And can I just ask one thing about that? Under the collective bargaining agreement, setting the statute aside for a moment, if Metro-North were to decide that a situation had been resolved, does the employee have a grievance mechanism? Well, not under the collective bargaining agreement necessarily, but they have an FELA remedy, and that would serve that. I see that my time is up, but I would like to – I'm sorry. I think I'm going to follow up with this. Yes. So your understanding is that one way after this interpretation of the statute that Metro-North could continue to provide these services and avoid interfering with the provision of medical treatment would be by having just an entirely independent medical provider that it wouldn't supervise and would have no input into the medical decision. It would just pay the bills, correct? If it did that, it would not be denying or delaying the provision of medical treatment. If that hypothetical also assumes that they had no say in directing the treatment at all or taking such actions as, for instance, requiring a certification from a doctor for a certain treatment or for FMLA coverage or something of that sort, which could still, no matter how much arm's length the provider is from Metro-North, Metro-North could still be judged as inserting itself improperly into the treatment. So your understanding of how the statute would work is its choices are either to completely disassociate itself from the medical treatment other than if it is offering this benefit, continuing to pay for it, or take on the burden in litigation if it were to make a decision that a situation has been resolved and an employee disagrees and decides to sue under this provision of showing that no reasonable doctor would disagree with the decision to terminate treatment at this point. I think that that is the situation that this interpretation leaves us with. But I also think that looking at the case in terms of whether the medical department is in-house or out-of-house misses the point, and that is that the medical decisions made by OHS personnel, no matter what their relation was to Metro-North, all of the evidence indicates that these were completely independent medical decisions. Metro-North's actions in this case did not interfere with that decision-making, and where I think the ARB gets it wrong is to suggest that any action that Metro-North takes that might affect the treatment now has interfered in the decision-making. The ALJ clearly was bothered by what happened and the decisions that were made, and she might be right that the wrong decision was made. They might have gotten this medically wrong, but Metro-North had nothing to do with their medical decision-making, and that's why they haven't violated Subsection C. With that, I'll leave the rest of my time for rebuttal, if I may. Good morning. May it please the Court, my name is Jesse Grauman. I represent the respondent, the United States Department of Labor. When Congress amended the Federal Railroad Safety Act, or FRISA, in 2008, it sought to protect railroad employees' ability to receive timely and appropriate medical care for workplace injuries. It therefore prohibited railroads from denying, delaying, or interfering with employees' medical treatment. We are here today because the respondent, Metro-North, did just that. Through its department, OHS, Metro-North violated the FRISA when it delayed and interfered with medical treatment. Wait a second. His department, OHS, has a contractor, right? Yes. Who has a contractual relationship with their medical personnel who are not employed by Metro-North, and Metro-North has some authority through the contract over what the contractor does, but they're engaged to provide independent medical decisions, right? I mean, I noticed in your brief that you often refer to Metro-North generally as including the Department of Occupational and Health Services as well as the contractor and the individuals, but there are distinctions, aren't there? I agree that there are distinctions, although I think substantial evidence supports the ALJ's finding affirmed by the ARB that at the end of the day those distinctions were not sufficient to separate out OHS from Metro-North, given the very close relationship. But not OHS. We're talking about Take Care Health, the contractor. Take Care Health itself is an independent company, but I think what the ALJ focused on properly was the component, OHS, of Take Care Health that was established entirely for the purpose of serving Metro-North's contractual needs. As I read the ALJ's decision and the ARB's endorsement of it, they were relying on the fact that there was a contract that could be terminated by Metro-North, that Metro-North had the authority to require the replacement of an individual. It was traded out, like go work someplace else for Take Care Health but not here, which of course you'd want in case the substandard care were being provided and there were complaints, and that the ALJ found the decision to call the back injury as resolved after a couple of months, that she was skeptical of it. Is that all there is or was there more? Because I didn't see evidence of direct communication by Metro-North exerting influence to interfere with or intervene in the treatment that Mr. Santiago was receiving. I think you're right, Your Honor. What we don't have in this case is the smoking gun. We don't have a communication from Metro-North to personnel at OHS saying, deny this individual's medical treatment. But there were two categories, which I think, Your Honor, are properly separated out. There is the overall structure of OHS, although it is technically a contractor, although Take Care Health is technically a contractor to Metro-North, there is, as was identified earlier, the constant presence by Metro-North at OHS's location, with Ms. Potaro, the administrator of OHS, exercising daily oversight, and Mr. Bradley, the vice president of human resources, having constant staff meetings. There is, as Your Honor identified, their ability to control the staffing of OHS, the ability to control the budget, the contract. But really, those are elements of any contract. So what I'm hearing is that any counsel advising Metro-North would say you can't have a contractor. You know, you're going to have to send your employees to a dock in a box someplace else and just pay the bill. Maybe you can kind of just agree that after eight weeks you're not going to provide any treatment at all. But if you have any contractual relationship, that's it. I don't know that that's quite the case. I think that the ARB said, you know, Metro-North can have what it referred to as an occupational health services department, which in this case was a contractor, but it has to establish a sufficient degree of independence from that contractor. And I think there are certainly examples that we can draw from where there are departments, whether in-house or out-of-house, where there is a sufficient degree of independence for the purpose of preventing conflicts of interest. So no staff meetings and no physical presence, no administrator or secretarial assistance? I would say that- It would seem minimal to me. I think you'd have to have a much more minimal presence. I think, you know, by analogy, I can think of, you know, where in government offices you have the inspector general's office, which, while it's part of the agency, is walled off from the rest of the agency to prevent conflicts of interest. And I think you see that in some fact patterns. I'm not terribly familiar with them, but I understand them to exist, for example, in the financial services industry where you have different components of a business. This was essentially an alter ego theory. Yeah, I think that's fair, although I think that the other- Should that be enough? Well, I think that then we go to the other category of reasons that the ALJ had for finding that the decision wasn't completely independent, and that was the nature of the decision in this case. Perhaps if all there was was the structure of OHS- As to the nature of the decision, she precluded Metro-North from introducing additional medical testimony on remand after that became an issue and said that she was confused about what the ARB was saying she had to look at. Well, again, I think the evidence that Metro-North sought to introduce, and some of which it referred to only very generally speaking that it wanted to introduce medical testimony on remand, we saw the evidence that they would have produced, which they didn't present to the ALJ, but they presented to the ARB. They made an offer of proof, and we would submit it would not meet the clear and convincing evidence standard. But just to make sure I understand the Labor Department's position, I hear you saying that if a rail carrier has a contractual relationship with a health care provider to cover injuries received on the job, that if it has someone physically present at the provider's- and they're not even the actual physical provider of care, right? They're just supervising the payment mechanism. Isn't that right there? That if they retain someone to monitor health care provision for on-the-job injuries, that they can be deemed to be the alter ego and to be intervening and interfering if they ever stop payment, for example. Well, again, I think exactly where to draw the line is ultimately going to be a fact-specific question, but we certainly wouldn't purport to say that Metro-North could not exercise any oversight responsibilities that one could exercise over a contractor. However, when it comes to having somebody there exercising daily oversight- What was the testimony about the oversight she exercised? I didn't really see much detail. My understanding is that she was there to essentially make sure that what OHS was doing was in conformance with Metro-North's policies for paying or not paying for treatment, for evaluating employees. She was there to make sure that what they were doing was consistent with Metro-North's policies. What is the standard of review on this issue? So on this issue, we would submit the standard review as substantial evidence, which we think actually is quite important here. And that, of course, even if two conclusions are possible, even if it might be possible for a fact-finder to look at these facts, as Metro-North, I think, would like a fact-finder to do, and say, yeah, there are some indicia of control, there are some indicia of lack of independence, but at the end of the day, there's no smoking gun. Even if you could look at that, only if a reasonable fact-finder would have to conclude that is reversal warranted in this case. But are we looking at a legal standard also? I mean, what constitutes intervention that's contrary to the statute? Well, I think what constitutes intervention was a legal finding made by the ARB saying if the railroad carrier interferes by interjecting itself into the process of care- But again, all that was found was there was a contract in place that provided the structure and a person on the premises. I don't know that that's – I would say that there is the contract structure, but there is also the facts of this case. And the facts of this case are a decision that was made that the ALJ found provided circumstantial evidence that the decision wasn't independent, and that was because the decision dismissed a considerable amount of medical evidence, dismissed the fact that Mr. Santiago's symptoms from his preexisting condition had completely resolved. They basically looked at all of the symptoms. So the ALJ disagreed with the finding that the condition had resolved, and therefore the contract provisions were given a lot of weight, and she found that this was intervention. But again, these were employees of the contractor. They were not employees of Metro-North who may have been an incorrect decision. Why does that get attributed to Metro-North? Again, I think it's because of going back to these two factors. It's the structure of the contract, which gave Metro-North considerable oversight powers, I think arguably more so than you would have in a traditional contractor relationship. Most contractors aren't located right next door. They don't necessarily have somebody on site all the time. But then, again, we have the decision in this particular case, which the ALJ found was very inconsistent with the medical evidence that was presented, which, again, I would submit is a factual finding subject to substantial evidence review. But it's also an interpretation of the statute in one that you would argue is reasonable, but to the extent that it hinges on a determination that complete disassociation from the medical carrier is what is required in order to not deny treatment if treatment is denied, that doesn't seem to me a substantial evidence determination. That's a construction of the statute. And it seems a little bit like it might be an elephant hiding in a mouse hole, looking at this particular C-1 provision. Well, again, I think that, you know, is complete disassociation required? I'm not sure. I think the point here is that, in this case, the level of intertwinement between Metro-North and OHS certainly does rise to the level where, as Judge Shin referenced, it really is a sort of an alter ego situation. You have the letterhead coming from Mr. Ella and Dr. Hildebrand that says, you know, it says at the top, Metro-North Take Care Health, and if they sign their names as Metro-North Railroad slash Take Care Health, you know, if that isn't intertwinement, if that isn't saying that the actions of one are attributed to another, if that's not indicative of a very close relationship between the two, I'm not sure what is. I see that my time is up. Would I be permitted to make two very brief points on the jurisdictional issue? Yes, I'd like to hear your comments on the jurisdiction. Sure. And just I think our positions largely are set forth in our brief, but there are two specific points made in the opening statement that I wanted to respond to. One was regarding whether it affects this court's subject matter jurisdiction. We think the law on that is very clear, that this circuit, this court in Zatz held that a defect in subject matter jurisdiction below does not affect the subject matter jurisdiction of this court. And so as I said ---- But doesn't our jurisdiction depend on the DOL having had jurisdiction? We have jurisdiction just to review those determinations. Well, this court has jurisdiction to review determinations of DOL. This court, you know, for example, could review a determination of DOL that it had jurisdiction and find that it didn't have jurisdiction. But, again, as this court has held, ultimately what this court has is jurisdiction to review decisions of DOL. But whether this court has jurisdiction doesn't depend on whether DOL had jurisdiction in the first instance. And that's something that this court has squarely held. So that was the first point I wanted to respond to. The second one was I think Meshner conceded that DOL has enforcement jurisdiction but argued that perhaps DOL could enforce C-1 through a different enforcement mechanism, not the complaint and investigation and adjudication procedures. And I think they posited in their reply brief, their final reply brief, that OSHA could enforce C-1 through citations. That's simply not the case. OSHA has enforcement. Under the provision they cited, which was 29 U.S.C. 658, that provides OSHA with citation power, but it's specifically a citation power only to enforce the Occupational Safety and Health Act, the OSHA Act, which is the primary statute that OSHA enforces. It doesn't provide OSHA with citation power with regard to any other statute. So it only can issue citations for violations of the OSHA Act itself or regulations or orders issued under the OSHA Act. There's no citation power for OSHA to issue a citation under FRISA. So with regard to jurisdiction, it really is either this process or it's nothing. The Department of Transportation is not taking these cases. OSHA is not issuing citations, cannot issue citations. And, again, as we submitted in our brief, we think that if you look at the statute as a whole, for all the reasons that many members of this panel have already cited, we think it's inescapable that the Department of Labor and specifically OSHA and the ALJ and the ARB had jurisdiction to adjudicate this case and have jurisdiction to adjudicate C-1 cases. Thank you, Your Honors. Good morning. May it please the Court, my name is Charles Goetsch. I represent the intervenor, Anthony Santiago. To follow up on your question, Your Honor, as far as the influence that Metro-North exerted, obviously they pay the budget, they have the right to terminate. Excuse me just a second, though. They have to be shown to have denied, delayed, or intervened, right? So influence is something a little more amorphous. Right. So how did they intervene? Just to be clear, Angela Bataro, the OHS administrator, is there every day, and she testified, she tells OHS personnel how to follow the Metro-North policies, tells them what Metro-North wants them to do. That was confirmed by her, the medical director, and the physician assistant. That's still pretty vague, though. Could you give an example of a policy that would be relevant to this particular decision that would constitute intervention in medical treatment? Well, so the question is, Your Honor, why would a truly independent doctor make a ruling that flies in the face of all the medical evidence other than to help Metro-North avoid paying medical bills? People make medical mistakes all the time. I mean, this was the fact that looking at the guide, they thought eight weeks is what a strain requires. They should have consulted maybe with the treating physician. So you think kind of disagreement or that this was so patently incorrect to say that the situation had resolved that it raises questions about their bona fides. Yes, and they admitted they failed to follow their own internal policies. Bataro said, without any exception, if they're going to change it from oc to non-oc, they've got to call the treating doctor every time. They never did that. Nobody did that. The explanation they gave that this is a back sprain that resolved, and the facts are there, it was simply there's no medical support for that. It was contrary to the actual medical evidence. So you think the ALJ just was inferring correctly from the poor quality of the decision that Metro-North influenced? Absolutely. I mean, why else would a truly independent doctor do that? I mean, the only inference is that they're furthering Metro-North's interest, which is to avoid paying a lot of medical bills. What is there in the record to show that that was Metro-North's policy to reduce these claims? Is there anything? No, they never admitted that they would not follow their own policies in order to avoid paying medical bills. There is evidence that they were required to pay 100%. What I heard you just say is that, in essence, is that they were carrying out Metro-North's policy to cut down on these claims. Their interest. Yeah. Is there anything in the record to support that, to show that, indeed, Metro-North was leaning on this entity to cut back on claims and to reduce? That was not admitted, Your Honor. No. It would have to be an inference. And, again, a truly independent medical doctor, why would they ignore the evidence? And the inference is drawn on the same facts that you just alluded to, that is, it wasn't reasonable, the manner in which this was conducted, and the decision was not reasonable. Therefore, we must infer that the policy of Metro-North was to cut down on these claims? Well, that Metro-North exercised some influence to further their interest through OHS. And, by the way, this- But Metro-North had no obligation to provide this medical service at all, right? They don't, and a lot of railroads don't. But this was Metro-North's choice. But could they have had, for example, a policy that will provide care and coverage for eight weeks after an incident giving rise to an injury and no longer? If they had a, perhaps, a collective bargaining agreement or something to that effect? Couldn't they negotiate that? And even if that resulted ultimately in some kind of delay in treatment, since they had no obligation to start out with, if they had an across-the-board policy to that effect, I'm not sure I would see how that would violate the statute. Well, the statute says that they cannot interfere, place themselves between a patient and the doctor who's treating them. So it's delay, deny, or interfere. Or interfere in any way. And so even if- Does denying payment interfere? Yes, because they have to pay 100 percent of occupational medical expenses even if they disagree on the appropriateness. That's established by the vice president. So when they changed it from OC to non-OC after the MRI showed or confirmed there was a herniated disc and now there's, you know, MUA treatment necessary, then they suddenly changed it to non-OC. Why? Based on- No, wait a second. They, oh, I guess you're saying after the- After the MRI and then the doctor said, right, now it suddenly becomes non-OC because it's a backsprain that's resolved. But there's no medical evidence to support that. But the denial was- Not the denial. The decision, the determination that the initial injury had resolved and that any further manifestation was due to the preexisting injury, that occurred before Mr. Santiago requested the manipulation under anesthesia. As I recall, yeah. No, it was after the MRI result came that there was a herniated disc confirming that. And then his treating doctor said, well, we have to treat it this way. That was denied by the PA. But Mr. Ellis, who's a physician assistant, not a doctor, said it was resolved. It then went to Dr. Hildebrand, the medical director, and she said, yes, it's a resolved backsprain. But Mr. Ellis said it was resolved before Mr. Santiago requested the manipulation under anesthesia, I think. After the MRI result, yes. The statute itself does include contractors. If you look at Section A, the initial language, it's railroads and railroad contractors and subcontractors are covered, obviously because Congress didn't want the railroads to simply contract out these things and avoid liability, avoid following what Section 20- But, again, the carrier has no obligation to provide any coverage at all. They don't. What they have is the private carrier that the employer contributes to, right? And that's what it went to, to Empire, after. And the problem here is that Metro-North contracted with Empire to cover only non-occupational injuries or medical treatment. So when they changed it to non-OC, he's left with no coverage through the Empire plan  Didn't Empire deny the manipulation under anesthesia because it was an experimental procedure, not because of the nature of the underlying injury? No, there's no evidence of that. And the ALJ said there's no evidence of why Empire denied it, other than they don't cover work-related medical expenses. That's confirmed. But anything else is pure speculation. And the burden- There's no evidence that that's the reason it was denied, is there? That they don't cover occupational health expenses. The Vice President of Metro-North confirmed that Empire does not cover non-occupational medical. Right, but does the record reflect that that is the reason Empire declined to pay for the procedure? There was a letter that was introduced at trial from Empire stating that it was an occupational injury. That was objected as hearsay by the Railroad and therefore didn't come in. So it's not- Right. Well, it's in the record, but it was rejected as hearsay. And there's no proof of what Empire reasons are. And the clear and convincing defense burden is on the Railroad, not on the employee. If there's nothing else, I thank you for your time. Thank you. I had reserved three minutes for rebuttal. I understand I went over in my first part of the argument, so I will try to be brief here with my rebuttal. I do want to just back up to the very first thing that the department mentioned, which is the purpose of this statute, which we haven't talked much about. And something that has not yet come up but I think is important is the temporal scope of subsection C-1. And that goes directly to the purpose of this statute. We've been talking a lot about the medical decisions that have been made. We've been talking about coverage for those medical decisions, payment for those medical decisions, or the treatment that derives from those medical decisions. But subsection C, and particularly C-1, is clearly concerned with the immediate aftermath of an injury. The whole point of this statute, and if you look at it broadly, just 20109 generally, this is a whistleblower anti-retaliation statute in general, at least parts of it. And it's designed to ensure that employees have some safeguards when they wish to or feel the need to report hazardous conditions, safety concerns, or injuries. Because reporting injuries is important so that the Railroad can identify a safety concern or hazardous condition and hopefully remedy the situation. This whole statute is designed to ensure that employees know that it is okay to report an injury. Subsection C-1 is particularly designed to ensure that if an employee is injured on the job, you're not going to have a supervisor come over and say, please don't report this injury, I don't want to get in trouble, or don't report this injury, it's going to make us look bad. Something that literally interferes with the employee's desire and ability to get emergency medical treatment. Where do you get the emergency part from? The emergency part comes from a plain reading of the statute, which I went more into in my briefs, but for right now I would just say if you look at the structure of the statute, C-1- What about the words? The first sentence certainly could be read to mean whenever an employee requires medical attention, the Railroad may not deny, delay, or interfere. Well, but the words are more specific than that. They say the medical or first aid treatment of an employee, and as I noted in my briefs, there are other OSHA regulations that deal with this exact terminology, medical or first aid treatment, and it's very clear in those instances that those are really about the first few minutes after an injury happens. There was one case I pointed to, the CMC Electric case, which talked about whether ten minutes was immediate enough. So there's that. You're saying this section only implies for the first few minutes after an injury? The immediate aftermath. There's case law that says, and CMC Electric said this as well, you can't put a per se limit on the number of minutes that we're talking about. But the design of the statute is, and the words of the statute mean, that this is about the immediate aftermath. Because then C-2- What are the words? You keep saying the words say that. What are the words that say that? The medical or first aid treatment of an employee who is injured during the course of employment. Why wouldn't medical treatment include treatment related to an occupational injury three months later? Because that's what following the orders of a treatment plan mean in C-2. If they're going to mean something different, and they have to because those words are only in C-2 and they're not in C-1. If that is going to mean anything, it has to be different from medical or first aid treatment. Following the orders of a treatment plan, that's extended treatment. Medical or first aid treatment, as the cases show and the regulations show, there's an immediacy to that. Does C-2 discuss discipline for violating one? Yes. If the answer is yes, then why wouldn't treatment plan also be contemplated by one? Because it's not included there, and that's an important difference. The second sentence of subsection C-1 is also important in understanding the temporal scope of that. And that talks about transportation to a hospital. That is clearly only about the immediate aftermath of an employee being injured on the job site. There's no other way to read that. And again, if C-2 is going to mean anything, if the words are going to, all of them, be given their meaning as they must, then the treatment plan must be different than medical or first aid treatment. Medical or first aid treatment, under the guidance of other regulations and cases that we cited in our papers, clearly deals with the immediate aftermath of an injury. Can I just ask, focusing on C-1 and medical treatment, if there's a back sprain that requires treatment over an extended period of time and an employee is absent from work during that period of time, that's something that has to be reported as a result of this work incident, these employee absences occurred? Yes. So why wouldn't medical treatment need to include a prolonged period if the employee is suffering a, just talking about the purpose of the statute now, not the text, but if the government has an interest in knowing how many days an employee is absent as the result of a work-related injury, you don't want interference with a course of medical treatment that may require some absences? That may be true, but the FRA reporting is dealt with separately. And again, I think that would be a stretch of the purpose of the statute. This particular provision, although it might be wise for Congress to say that you must also ensure that an employee gets the extended treatment that they need, they didn't say that. And C-1, the purpose is to make sure that an employee feels safe and knows that they have legal protections for reporting an injury, period. What happens after that is dealt with through the FRA, through the FELA, through the collective bargaining agreement. Thank you very much. Thank you all. Well argued.